# AIG HAWAII INSURANCE COMPANY, INC., Plaintiff–Appellee, v. THE ESTATE OF NELSON CARAANG, MARCELO CARAANG, and ANGELA CARAANG, Defendants–Appellants, and ILMAR GODINEZ and EMANUEL VILAMOR, Defendants

## NO. 15750

### (CIV. NO. 89–3175–10)

### MAY 10, 1993

### MOON, C.J., KLEIN, LEVINSON, AND NAKAYAMA, JJ., AND CIRCUIT COURT JUDGE MILKS, ASSIGNED BY REASON OF VACANCY

## OPINION OF THE COURT BY LEVINSON, J.

The defendants–appellants The Estate of Nelson Caraang, Marcelo Caraang, and Angela Caraang (the Caraangs) appeal from the circuit court's (the trial court) declaratory judgment determining that the automobile insurance policy (the policy) issued to Bonifacio (Bonifacio) and Cathy (Cathy) Godinez by the plaintiff–appellee AIG Insurance Company, Inc. (AIG) does not require AIG to defend and indemnify the defendants Ilmar Godinez (Godinez) and/or Emanuel Vilamor (Vilamor) for bodily injury claims (the tort claim) arising out of the August 6, 1989 death of Nelson Caraang (Nelson).[1]

For the reasons set forth in this opinion, we reverse the trial court's judgment declaring that AIG does not have a duty to defend and indemnify Godinez under the policy and remand for entry of judgment in favor of the Caraangs and against AIG. In all other respects, we affirm.

---

[1] Godinez and Vilamor are not parties to this appeal.

## I. BACKGROUND

The facts of the present case are undisputed. On the night of August 6, 1989, Godinez drove Vilamor to a party in a 1986 Ford Ranger Pickup (the truck) owned by Godinez's father (Bonifacio) and stepmother (Cathy). The truck was a "covered auto" under the policy. Pursuant to the policy, which provides bodily injury liability coverage (liability coverage) of $35,000.00 per person, AIG agreed to pay compensatory damages for bodily injury for which any "covered person" becomes legally responsible because of an "auto accident." The policy defines a "covered person" to include the "named insureds" — Bonifacio and Cathy — and any "family member" for the "ownership, maintenance or use of any auto" and "[a]ny person using [a named insured's] covered auto with [a named insured's] permission." The policy contains an intentional act exclusion that denies liability coverage to "any person who intentionally causes bodily injury . . . ."

After remaining at the party for about ten minutes, Godinez drove Vilamor to the house of a friend. While at the house, Vilamor "did drugs." Following a telephone call, Vilamor asked Godinez to drive him to the Fernandez Fun Factory in Waikiki in order to meet the caller.

After leaving the Fernandez Fun Factory, Godinez drove Vilamor through Waikiki. While doing so, Godinez and Vilamor observed Nelson driving on Kuhio Avenue. There was a great deal of animosity between Vilamor and Nelson because Sherry Baclaan, Vilamor's former girl friend, had "broken up" with him in order to "go with" Nelson. About a week before the night of the incident, a dispute had taken place at Sherry Baclaan's home, during which Vilamor had "pulled" a small gun on Nelson.

As Godinez and Vilamor passed Nelson's vehicle, Nelson began to follow the truck and yell at them. Nelson shouted taunts peppered with profanity at Vilamor, proclaiming that he had a bigger gun than Vilamor and daring Vilamor to have a "shoot out." Vilamor instructed Godinez to keep driving; although Godinez attempted to elude Nelson, traffic was too heavy for him to do so. Meanwhile, Nelson repeatedly pulled alongside the truck as the two vehicles departed Waikiki onto the H–1 Freeway.

While on the H–1, Nelson tried to "cut off" the truck and force it to pull over. Hoping to evade Nelson, Godinez drove the truck onto the Pali Highway exit with Nelson's vehicle in hot pursuit. Proceeding up the Pali Highway, the truck was in the left–hand lane and Nelson's vehicle was in the right–hand lane. Nelson continued his exhortations regarding a "shoot out."

As the truck approached the Pali Tunnel, Godinez heard a loud "pop" sounding like a firecracker, turned his head toward Vilamor, and saw him standing on the passenger's seat with the upper half of his body protruding out of the window. Although Godinez knew that Vilamor owned a gun, Godinez did not know that he had it in his possession until Godinez heard the "pop." After the "pop," Vilamor sat down and was silent until Godinez drove the truck back toward Honolulu on the Likelike Highway. Vilamor then informed Godinez that he had shot Nelson. Nelson died as a result of the gunshot wound inflicted by Vilamor.

On October 13, 1989, AIG filed a complaint for declaratory relief in response to the tort claim asserted by the Caraangs against Godinez and Vilamor for the bodily injury to and death of Nelson. In the complaint, AIG denied any contractual duty to defend or indemnify Godinez and Vilamor on the grounds that: (1) the shooting

was not an "auto accident" and the policy excluded coverage for any person who intentionally caused bodily injury; and (2) the shooting did not arise out of the ownership, maintenance, or use of any auto.

A jury–waived trial was conducted in the circuit court on August 12, 1991. The trial court subsequently rendered the following conclusions of law (COL): [2]

1. An insurance company's obligation to defend and/or indemnify an insured is a purely contractual obligation and consequently depends on the language contained in the applicable insurance policy.

2. The terms of the insurance policy should be interpreted according to their plain, ordinary and accepted sense in common speech in line with the objectively determined reasonable expectations of a lay person.

3. The shooting death of Nelson . . . did not arise out of an auto accident.

4. The shooting death of Nelson . . . did not arise out of the ownership, maintenance or use of [the truck].

5. By shooting Nelson . . . , defendant Vilamor intentionally caused bodily injury to Nelson . . . .

6. An automobile insurance carrier's duty to defend an insured against claims made in the complaint arises when allegations of the complaint raise a "potentiality" for indemnification of the insured under the terms of the policy.

---

[2] On appeal, the Caraangs do not challenge any of the trial court's findings of fact.

7. Objectively determined, defendant Godinez should have no reasonable expectations of either a defense or indemnification under the bodily injury liability coverage under [the policy] for claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

8. Objectively determined, defendant Vilamor should have no reasonable expectations of either a defense or indemnification under the bodily injury liability coverage under [the policy] for claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

9. Because the shooting of Nelson . . . did not arise out of an auto accident, defendant Godinez would not be owed a defense and/or indemnification under [the policy] against claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

10. Because the shooting of Nelson . . . did not arise out of an auto accident, defendant Vilamor would not be owed a defense and/or indemnification under [the policy] against claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

11. Because the shooting death of Nelson . . . did not arise out of the ownership, maintenance or use of [the truck], defendant Godinez would not be owed a defense and/or indemnification under [the policy] against claims made against him in [the

tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

12. Because the shooting death of Nelson . . . did not arise out of the ownership, maintenance or use of [the truck], defendant Vilamor would not be owed a defense and/or indemnification under [the policy] against claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

13. Because by shooting Nelson . . . , defendant Vilamor intentionally caused bodily injury to Nelson . . . , defendant Vilamor would not be owed a defense and/or indemni[fication] under [the policy] against claims made against him in [the tort claim] filed by [the Caraangs] for damages that arose out of the shooting death of Nelson . . . .

On November 7, 1991, the trial court filed a judgment in favor of AIG and against the Caraangs, declaring that the policy did not require that AIG either defend or indemnify Godinez and/or Vilamor against claims arising out of the shooting death of Nelson. The Caraangs filed a timely notice of appeal.

On appeal, the Caraangs challenge COL Nos. 3 through 13. Specifically, the Caraangs urge that AIG has a duty to defend and indemnify Godinez and Vilamor because: (1) Nelson's death was accidental; and (2) Nelson's death arose out of the ownership, maintenance, or use of an auto.

## II. STANDARD OF REVIEW

A COL is not binding upon an appellate court and is freely reviewable for its correctness. . . . A COL that is supported by the trial court's [find-

ings of fact] and that reflects an application of the correct rule of law will not be overturned. . . . However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because "the court's conclusions are dependent upon the facts and circumstances of each individual case."

*Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28–29, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citations omitted).

## III. DISCUSSION
### A. Godinez
### 1. Godinez is a covered person under the policy.

Under Part A of the policy, liability coverage extends only to "covered persons." Part A defines a "covered person" in relevant part to include (1) "named" insureds (in this case, Bonifacio and Cathy) and "any family member for the ownership, maintenance or use of any auto" and (2) "any person using [the] covered auto with [a named insured's] permission." Although the question whether Godinez is a "covered person" under the policy was never expressly addressed by either the trial court or the parties, it is nevertheless foundational to determining whether AIG has a duty to defend and indemnify Godinez with respect to the tort claim.

The policy defines a "family member" to include "a person related to [the named insureds] by blood, marriage or adoption who is a resident of [the named insureds'] household, including a ward or foster child." It is apparent from the record that Godinez does not qualify as a covered person under this definition. The record reflects that Godinez is related by blood to Bonifacio; however, at the time of the shooting, Godinez was living with his natural

mother, Daylinda Ginelsa, aka Daylinda Godinez (Daylinda). It is uncontroverted that, on August 6, 1989, Daylinda was neither a named insured nor related to a named insured by blood, marriage, or adoption and residing in the same household. Therefore, Godinez was not a family member of a named insured at the time of the shooting and cannot qualify as a "covered person" on that basis.

Regarding the question whether Godinez qualifies as a "covered person" under the policy on the basis that he was "using" the truck with a named insured's permission, we note that "use" is not defined in Part A — the liability coverage section — of the policy.[3] We have stated, however, that an insurance contract is construed according to the entirety of its terms and conditions as set forth in the policy. ***Methven–Abreu v. Hawaiian Ins. & Guar. Co.***, 73 Haw. 385, 390, 834 P.2d 279, 283, *reconsideration denied*, 73 Haw. 625, 838 P.2d 860 (1992); *see also* HRS § 431:10C–237 (1987 Spec. Pamphlet). In this connection, Part G of the policy, the "State of Hawaii Basic No–Fault Endorsement" providing coverage as required under Hawaii's no–fault law, is instructive. Under Part G, "operation, maintenance, or *use* . . . with respect to a motor vehicle" is defined to include "occupying" the vehicle. (Emphasis added.) *Cf.* HRS § 431:10C–103(13) (1987 Spec. Pamphlet). Construing the policy as a whole, this definition clarifies the meaning of "use" as employed in Part A to include "occupying" the truck — a "covered auto" listed on the declarations page of the policy. Part A further defines the term "occupying" to mean "in, upon,

---

[3] The parties assumed throughout the pendency of this matter at the trial level that Godinez was "using" the truck at the time of the shooting. *See infra* note 4.

getting in, on, out or off." Thus, any person in, upon, getting in, on, out, or off the truck with Bonifacio's permission on the night of the shooting was a "covered person" under the policy.

It is undisputed that Godinez was driving the truck on the night of August 6, 1989. Accordingly, he was "occupying" the vehicle and therefore "using" it. Furthermore, the record clearly indicates that Godinez had permission from Bonifacio to drive the truck.[4] Therefore, we hold that Godinez was a "covered person" under the terms of the policy on August 6, 1989.

2. **From Godinez's viewpoint or perspective, the shooting death of Nelson was an accident.**

Regarding the events of August 6, 1989, the trial court, *inter alia*, entered the following unchallenged findings of fact (FOF):

> 9. Vilamor told . . . Godinez to keep driving and although . . . *Godinez tried to get away from*

---

[4] In his deposition, Godinez testified in relevant part:

Q. [By AIG's counsel:] When you started using [the truck] in 1988, were you pretty much the only person who used it?

A. Yes.

Q. Why do you have it registered to your dad still, if you're the person who primarily uses it?

A. He was going to transfer it, but the payment was close, so my dad told me, wait, don't have to transfer it to my name because — so that way would be easier, we have to go through so much trouble.

. . . .

Q. When did you stop feeling that you needed permission?

A. When he didn't — he just gave me the keys and, you know — he just stopped using the truck for his part–time job anymore. He did not use it anymore.

*the vehicle driven by Nelson . . .* , traffic was too heavy for him to do so.

10. Nelson . . . kept pulling up along side the [truck] driven by . . . Godinez during which time . . . Godinez was driving out of Waikiki on to the H–1 Freeway.

11. While on the freeway, Nelson . . . tried to "cut off" the vehicle driven by . . . Godinez so as to force . . . Godinez's vehicle to "pull over."

12. At that time, . . . *Godinez saw the turn for the Pali Highway and took it in the hope of losing . . . Nelson . . . .*

13. Nelson . . . managed to get across the divider and also get on the Pali Highway.

14. As the two vehicles proceeded up the Pali Highway, . . . Godinez was in the left–hand lane with Nelson['s] . . . vehicle in the right–hand lane.

15. As the vehicles proceeded up the Pali Highway, Nelson . . . continued to shout about a "shoot out."

16. As . . . Godinez drove toward the Pali Tunnel, he heard a loud "pop" like a firecracker, turned his head and saw . . . Vilamor standing on a bench seat with the upper half of his body outside the window.

17. *Godinez* knew . . . Vilamor [owned] a gun, but *did not know . . . Vilamor had the gun with him that night until after he heard the . . . "pop."*

18. After the . . . "pop", . . . Vilamor sat down and said nothing to . . . Godinez until they were proceeding back to Honolulu on the Likelike Highway at which time . . . Vilamor told . . . Godinez that he had shot Nelson . . . .

(Emphasis added.)

It is therefore uncontroverted that: (1) throughout the events preceding the shooting, Godinez was attempting to evade Nelson's vehicle but failed to do so because of traffic conditions and Nelson's persistent hot pursuit of the truck; and (2) Godinez was unaware that Vilamor was in possession of a gun until after Vilamor fired it at Nelson and therefore could not possibly have foreseen the shooting or done anything to prevent it.

Nevertheless, pursuant to COL Nos. 3 and 9, the trial court concluded as a matter of law with respect to Godinez that the shooting death of Nelson did not arise out of an auto accident and, therefore, AIG owed Godinez no duty under the policy to defend or indemnify him in connection with the tort claim. But because the trial court's undisputed FOF, on which its conclusions of law depend, do not support COL Nos. 3 and 9 regarding Godinez, we hold that these conclusions are clearly erroneous. *See Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 28–29; *Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 886 (1991).

We begin our analysis with the observation that " '[i]nsurance policies are governed by statutory requirements in force and effect at the time such policies are written. . . . Such provisions are read into each policy issued thereunder, and become a part of the contract with full binding effect upon each party.' " *National Union Fire Ins. Co. v. Ferreira*, 71 Haw. 341, 344, 790 P.2d 910, 912 (1990) (quoting 13 J. APPLEMAN, INSURANCE LAW & PRACTICE § 382, at 23–24 (1976) (footnotes omitted)).[5] Moreover, "[t]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . And

---

[5] The effective date of the policy in the present case was June 3, 1989.

where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Id.* at 345, 790 P.2d at 913 (citations omitted).

With respect to bodily injury liability insurance coverage, the policy at issue in the present case is governed by those provisions of the Hawaii Insurance Code, HRS ch. 431 (1987 Spec. Pamphlet and Supp. 1992), that were in effect as of the policy's effective date. HRS § 431:10C–104(a) (1987 Spec. Pamphlet) provides in relevant part that "no person shall operate or use a motor vehicle . . . at any time unless such motor vehicle is insured at all times under a no–fault policy."[6] HRS § 431:10C–301 (Supp. 1992), relating to "[r]equired motor vehicle policy coverage," provides in relevant part:

> (a) In order to meet the requirements of a no–fault policy . . . , an insurance policy covering a motor vehicle shall provide:
>
> . . . .
>
> (2) Insurance to pay on behalf of the owner or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the

---

[6] Apropos of our holding in section III. A. 1. of this opinion that Godinez is a "covered person" under the policy, it is noteworthy that "operation" and "use" of a motor vehicle are not synonymous for purposes of HRS § 431:10C–104(a). "[A] statute ought to be construed to avoid making any word superfluous . . . ." *Yamaguchi v. State Farm Mut. Auto. Ins. Co.*, 706 F.2d 940, 947 (9th Cir. 1983) (citing *In re City & County of Honolulu Corp. Counsel*, 54 Haw. 356, 374, 507 P.2d 169, 178 (1973)). Although the holding of *Yamaguchi*, which is immaterial to the present case, was disapproved in *Rana v. Bishop Ins. of Hawaii, Inc.*, 6 Haw App. 1, 9–10, 713 P.2d 1363, 1369–70, *aff'd*, 68 Haw. 269, 713 P.2d 1363 (1985), the proposition cited above remains a sound rule of statutory construction.

named insured, sums which the owner or operator may legally be obligated to pay for injury [or] death . . . of others . . . which arise out of the ownership, operation, maintenance, or use of the motor vehicle . . . .

(b) A motor vehicle insurance policy shall include:

(1) Liability coverage . . . for all damages arising out of accidental harm sustained by any . . . person as a result of any . . . accident applicable to each person sustaining accidental harm arising out of the ownership, maintenance, [or] use of the insured vehicle . . . .

HRS § 431:10C–103(1) (1987 Spec. Pamphlet) defines "accidental harm" to mean "bodily injury, death, sickness, or disease caused by a motor vehicle accident to a person." And HRS § 431:10C–103(9) (1987 Spec. Pamphlet) defines "motor vehicle accident" in relevant part to mean "an accident arising out of the operation, maintenance, or use of a motor vehicle . . . ."

The question whether Nelson's death constituted "accidental harm" must be answered from the viewpoint or perspective of the person — in this instance, Godinez — claiming the status of an insured. *Hawaiian Ins. & Guar. Co. v. Blanco*, 72 Haw. 9, 16, 804 P.2d 876, 880 (1990); *Ganiron v. Hawaii Ins. Guar. Ass'n*, 69 Haw. 432, 435, 744 P.2d 1210, 1212 (1987); *Hawaiian Ins. & Guar. Co. v. Brooks*, 67 Haw. 285, 292, 686 P.2d 23, 27–28 (1984). In this connection we have ruled that "if the insured did something or . . . failed to do something, and the insured's expected result of the act or omission

was the injury, then the injury was not caused by an accident and therefore not . . . within the coverage of the policy . . . ." *Blanco*, 72 Haw. at 16, 804 P.2d at 880 (insured fired rifle in victim's direction, intending to frighten but instead injuring him; injury held to be reasonably foreseeable and therefore not accidental from insured's viewpoint; consequently, insurer had no duty to defend); *see also Brooks*, 67 Haw. at 292, 686 P.2d at 27–28 (from perspective of insured truck driver, sexual assault of hitchhiker in rear section of vehicle by insured's co–worker not accidental where insured aware of attack but chose not to do anything to prevent or mitigate harm to victim, thereby facilitating commission of act; insurer held to have no duty to defend or indemnify).

On the other hand, we have held that a gunshot injury sustained by the occupant of one motor vehicle at the hand of the occupant of another can constitute "accidental harm," thus giving rise to coverage, where there is a territorial "nexus" between the injury and "the operation, maintenance, or use of the vehicles in question." *Ganiron*, 69 Haw. at 434–35, 744 P.2d at 1212. The teaching of *Blanco* and *Brooks*, however, is that, in order for the insurer to owe a duty to defend or indemnify, the injury cannot be the expected or reasonably foreseeable result of the insured's own intentional acts or omissions. The analysis thus comes full circle; whether an injury is caused by a motor vehicle "accident" or by an insured's intentional act is determined from the viewpoint or perspective of the insured.

In the present case, the trial court's unchallenged FOF simply do not support its conclusion that, as to Godinez, Nelson's death did not arise out of a motor vehicle accident. On the contrary, the FOF unequivocally establish that: (1) from Godinez's perspective, the death

was not the expected or anticipated result of any intentional act or omission on his part; (2) Godinez, being unaware the shooting was taking place, obviously made no decision to refrain from preventing Nelson's death or otherwise mitigating the harm; and (3) Godinez did nothing to facilitate the shooting. In fact, it appears that Godinez's constant effort was to elude Nelson via the instrumentality of the truck, and he was wholly unaware that Vilamor was in possession of a firearm until after the shooting occurred. Accordingly, from Godinez's viewpoint or perspective Nelson's death was accidental. That being the case, we hold that the trial court erred in concluding that AIG does not owe Godinez a duty to defend or indemnify on the basis that the shooting did not arise out of a motor vehicle "accident."

### 3. Nelson's death arose out of the ownership, maintenance, or use of a motor vehicle.

Pursuant to COL Nos. 4 and 11, the trial court concluded that AIG did not have a duty under the policy to defend and/or indemnify Godinez because the shooting death of Nelson did not arise out of the ownership, maintenance, or use of the truck. Inasmuch as these COL present mixed questions of fact and law, we review them under the clearly erroneous standard. *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 28–29; *Coll v. McCarthy*, 72 Haw. at 28, 804 P.2d at 886.

The basic insurance agreement regarding liability coverage, as set forth in Part A of the policy, obligates AIG to "pay compensatory damages for bodily injury . . . for which any covered person becomes legally responsible because of an *auto accident*." (Emphasis in original

deleted and additional emphasis added.) The term "auto accident" is nowhere defined in the policy. However, as noted above, the policy defines the term "covered auto" to include the truck. Moreover, Part G of the policy defines "motor vehicle accident" to include "an accident arising out of the *operation, maintenance, or use* of a *motor vehicle* . . . ." (Emphasis in original.) The same part defines a "motor vehicle" to mean "any vehicle of a type required to be registered under Chapter 286 of the Hawaii Revised Statutes . . . ." HRS § 286–41(a) (Supp. 1992) requires "[e]very owner of a motor vehicle which is to be operated upon the public highways . . . [to] apply . . . for the registration thereof." HRS § 286–2 (1986) defines a "motor vehicle" to include "every vehicle [except mopeds] which is self–propelled . . . ." The same section defines "vehicle" to include "every device . . . by which any person or property is or may be transported . . . upon a highway," excluding "devices moved by human power" (such as bicycles), devices used exclusively on rails or tracks, and mopeds. Thus, construing the policy according to the entirety of its terms and conditions, *see Methven–Abreu*, 73 Haw. at 390, 834 P.2d at 283, and its plain, ordinary, and accepted sense in common speech, *see Hawaiian Ins. & Guar. Co. v. Financial Sec. Ins. Co.*, 72 Haw. 80, 87, 807 P.2d 1256, 1260, *reconsideration denied*, 72 Haw. 616, 841 P.2d 1074 (1991), it is apparent that the truck is an "auto" and that a "motor vehicle accident" is an "auto accident" within the meaning of the policy.

We have already established that Godinez was "using" the truck on the night of the shooting and that, from his viewpoint or perspective, Nelson's death was an "accident." Thus, the "critical question" becomes whether the death "arose out of" that use. *Cf. Ganiron*, 69

Haw. at 434, 744 P.2d at 1212. Urging that bodily injury flowing from *Vilamor's* intentional conduct cannot "arise out of" the use of a motor vehicle, AIG argues that: (1) Nelson's death did not arise out of the use of the truck; and, therefore, (2) AIG has no duty to defend and/or indemnify Godinez with respect to the tort claim. We disagree.

In *Brooks*, we acknowledged that the sexual assault victim's injuries "may have arisen from the use" of the insured vehicle. 67 Haw. at 292, 686 P.2d at 27. Nevertheless, we affirmed the summary judgment entered by the circuit court in favor of the insurer in that case, not because the sexual assault did not arise from the ownership, maintenance, or use of the insured vehicle, but because, viewed from the perspective of both the rapist and the driver, the injuries were not accidental. *Id.* at 292, 686 P.2d at 27–28. Accordingly, the *Brooks* decision does not foreclose the possibility of an insurer's duty to defend and indemnify an insured notwithstanding the intentional or even criminal conduct of a third person. Implicit in our holding in *Brooks* was the potentiality that the insured driver would have been eligible for coverage if his conduct had been innocent or merely negligent, *i.e.*, if viewed from his perspective the injuries suffered by the victim had been an accident. That being the case, it follows that an intentional act does not necessarily sever bodily injury caused thereby from the "use" of an insured vehicle.

Any ambiguity in this regard was eliminated by *Ganiron*, in which we expressly held that gunshot injuries intentionally inflicted on one motor vehicle operator by another constituted a "motor vehicle accident" within the meaning of the statutory predecessor to HRS

§ 431:10C–103(9), precisely because "it occurred because of the operation, maintenance, or use of the vehicles in question." 69 Haw. at 435–36, 744 P.2d at 1212. The fact that eligibility for "first–party" no–fault and uninsured motorist insurance coverage was at issue in *Ganiron* whereas eligibility for "third–party" liability insurance coverage is at issue in the present case in no way diminishes the applicability of *Ganiron* to our analysis. *See, e.g.*, **Continental Western Ins. Co. v. Klug**, 415 N.W.2d 876, 877–79 (Minn. 1987) (on facts similar to *Ganiron*, insurer sought declaratory judgment that it had no liability under *no–fault* and *uninsured motorist* provisions of auto policy; court held that insured's gunshot injuries arose out of use of uninsured motorist's auto where (1) extent of causation between auto and injury made auto "active accessory" in causing injury, (2) no act of independent significance occurred breaking causal link between "use" of auto and injuries inflicted, and (3) injuries resulted from use of auto for transportation purposes); **State Farm Mut. Auto. Ins. Co. v. Davis**, 937 F.2d 1415, 1416, 1419–22 (9th Cir. 1991) (on facts similar to *Ganiron*, auto insurer sought declaratory judgment that its *liability* policy did not cover highway shooting carried out by insured while passenger in own vehicle; citing *Klug* with approval, court held that shooting resulted from ownership, maintenance, or use of insured's auto where use of insured auto had more than "minimal causal connection" with incident leading to victim's injuries).

The trial court's own uncontroverted FOF clearly establish that the use of the truck had more than a "minimal causal connection" with Nelson's shooting death; indeed, they confirm that: (1) the extent of causation between the truck and the death rendered the truck an "active accessory"; (2) no act of independent significance

occurred such as to break the causal link; and (3) the death resulted from the use of the truck for transportation purposes. Godinez was transporting Vilamor from the Fernandez Fun Factory in Waikiki when they first encountered Nelson driving his vehicle (FOF Nos. 3 and 4). As Godinez maneuvered the truck past Nelson's vehicle, Nelson first began to follow the truck, yelling all the while (FOF No. 7). Nelson repeatedly directed profane taunts at Vilamor, challenging the latter to have a "shoot out" (FOF No. 8). Vilamor expressly directed Godinez to keep driving, motivating Godinez to escape Nelson's vehicle (FOF No. 9). Godinez was unsuccessful in his effort to elude Nelson due to traffic congestion (FOF No. 9). Nelson persisted in pulling his vehicle alongside the truck and at one point attempted to cut off the truck on the H–1 Freeway so as to force the truck to come to a halt (FOF Nos. 10 and 11). Nelson's persistent aggression prompted Godinez to turn onto the Pali Highway in the hope of "losing" Nelson's vehicle (FOF No. 12). Nelson crossed a traffic divider in order to pursue the truck, continuing to provoke Vilamor as the two vehicles traveled abreast of one another up the Pali Highway (FOF Nos. 13, 14, and 15). Finally, unbeknownst to Godinez, Vilamor fired his gun at Nelson and said nothing about it until Godinez had proceeded to the windward side of Oahu and directed the truck back to Honolulu on the Likelike Highway (FOF Nos. 16, 17, and 18).

Inasmuch as bodily injury resulting from an intentional act can, and in the present case did, arise out of the use of a motor vehicle, we hold that the trial court was clearly erroneous in concluding that Nelson's death did not arise out of Godinez's ownership, maintenance, or use of the truck.

### 4. AIG has a duty to defend and indemnify Godinez regarding the tort claim.

Because (1) Godinez is a "covered person" under the policy, (2) from Godinez's viewpoint or perspective, the shooting death was accidental, and (3) the shooting arose out of Godinez's use of the truck, we hold, as a matter of law, that AIG has a duty to defend and indemnify Godinez. We therefore reverse the trial court's judgment in favor of AIG and remand for entry of judgment in favor of the Caraangs.

### B. AIG Has No Duty to Defend and Indemnify Vilamor Regarding the Tort Claim.

Pursuant to COL Nos. 3, 5, 10, and 13, the trial court concluded as a matter of law that AIG owed no duty under the policy to defend and/or indemnify Vilamor in connection with the tort claim because the shooting death of Nelson was not accidental, but rather the result of Vilamor's intentional conduct. Inasmuch as these COL are overwhelmingly supported by the trial court's FOF, at least from the viewpoint or perspective of Vilamor, we will not disturb them. *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 29 (citation omitted).

Not surprisingly, the Caraangs do not contest the trial court's FOF that Vilamor shot Nelson and that Nelson died as a result thereof (FOF Nos. 16, 18, and 19). The Caraangs, however, refer in their amended opening brief to deposition testimony (which was received in evidence at trial) that, after the incident, Vilamor told a police detective that he had fired his gun in an effort to stop or deter Nelson from following the truck and continuing his taunts; specifically, Vilamor claimed that he merely intended to frighten Nelson by striking his vehicle. But

even assuming that the trial court accepted the hearsay at face value, "we do not see how it can logically be said that . . . the injury to [Nelson] was the result of an accident." *See Blanco*, 72 Haw. at 18, 804 P.2d at 881. Granting, *arguendo*, that Vilamor fired the gun in Nelson's direction intending to frighten him, "[t]hat physical injury might result from such an action is certainly something which a reasonable man in [Vilamor's] position should have anticipated and expected." *See id.*

We hold that the trial court was correct in concluding, from Vilamor's viewpoint or perspective, that the shooting death of Nelson did not arise out of an auto accident, but rather was intentionally caused. We have recognized in the past that the objectively reasonable expectations of policyholders and intended beneficiaries regarding terms of insurance policies will be honored. *See, e.g., Blanco*, 72 Haw. at 18, 804 P.2d at 881; *Brooks*, 67 Haw. at 290–91, 686 P.2d at 27. Thus, assuming that Vilamor was otherwise a "covered person" under the policy (an issue we need not reach in this opinion), and in light of the exclusion from liability coverage of any person who intentionally causes bodily injury, Vilamor "could not reasonably expect to be covered or defended" with respect to Nelson's death. *See Blanco*, 72 Haw. at 11, 15, 18–19, 804 P.2d at 878–79, 881. Accordingly, we hold that the trial court was correct in concluding as a matter of law that AIG owes Vilamor no duty to defend and indemnify with respect to the tort claim.

## IV. CONCLUSION

We reverse the portion of the trial court's November 7, 1991 judgment declaring that the policy does not require AIG to defend and/or indemnify Godinez regarding the

tort claim and remand for entry of judgment in favor of the Caraangs and against AIG consistent with this opinion. We affirm in all other respects.

On the briefs:

*Charles J. Ferrera* and *Adelina Simpliciano* for defendants–appellants The Estate of Nelson Caraang, Marcelo Caraang, and Angela Caraang.

*Carleton B. Reid* and *John T. Hassler* (Reid, Richards & Miyagi) for plaintiff–appellee AIG Hawaii Insurance Company, Inc.