**Earl P.K. HASKELL and Loralee K. Haskell, Plaintiffs,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., Defendants.**

**No. CIV.01–00183 SOM/KSC.**

United States District Court, D. Hawai'i.

Feb. 8, 2002.

James J. Bickerton, Bickerton Saunders & Dang, Honolulu, HI, for plaintiffs.

Mark Morita, Richard Miller, Tom Petrus & Miller, LLC, Honolulu, HI, for defendants.

*AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT.*

MOLLWAY, District Judge.

## I. INTRODUCTION.

Plaintiff Earl Haskell ("Haskell"), a police officer shot by Peter Moses ("Moses"), sues for automobile insurance benefits to cover his injuries. Although neither Moses nor Haskell was in a car at the time of the shooting, Haskell contends that he has insurance coverage under the uninsured motorist provisions of two automobile policies. Because this court concludes that Haskell's injuries did not arise out of the operation, maintenance, or use of a car, the court finds that the uninsured motorist provisions do not apply. Accordingly, the court grants summary judgment in favor of State Farm Mutual Automobile Insurance Company ("State Farm"). The court denies Haskell's cross-motion for summary judgment.

## II. BACKGROUND FACTS.

On September 11, 1998, Haskell was patrolling Makapuu Point, an area in East Oahu between Makapuu Beach and Sandy Beach. *See* Declaration of Earl P.K. Haskell (November 13, 2001) ¶ 6. As Haskell was driving from the direction of Makapuu Beach towards Sandy Beach, a bicyclist flagged him down and said that, farther down the road, a man appeared to be breaking into a white Pontiac Grand Am ("Pontiac"). *Id.* at 9. From where Haskell had pulled over to talk to the bicyclist, Haskell could see the Pontiac, which was parked on the shoulder of the lane going towards Makapuu Beach. Haskell drove toward the Pontiac and parked his car directly across the street from it. *Id.* ¶ 10. Haskell says that he saw a hand on the Pontiac's steering wheel and then saw Moses' head "pop up" inside the Pontiac. *Id.* ¶ 11; Criminal Trial Testimony ("Testimony") of Earl Haskell (September 2, 1999) at 15. Apparently, Moses had opened the door on the passenger side (the side away from the street) by taking out the keyhole with a screwdriver. Testimony of Peter Moses (September 9, 1999) at 19; Haskell Decl. ¶ 23.

Moses has a different description of where he was when Haskell saw him. Moses says that he was *standing* outside the Pontiac and "leaning" into the Pontiac when Haskell arrived. *Id.* at 20. Thinking that Moses was trying to steal the Pontiac,[1] Haskell called for back-up. Has-

---

**1.** State Farm argues that this court should disregard Haskell's "sham" declaration be-

kell Decl. ¶¶ 12–13; Haskell Testimony at 15. Officers John Veneri ("Veneri") and Laura Chong ("Chong") responded by driving to Makapuu Point. Declaration of John Veneri (November 13, 2000) ¶ 9.

Standing outside the Pontiac, Moses told Haskell that the Pontiac belonged to Moses' family, then, at Haskell's request, sat on the front of the Pontiac. Haskell Decl. ¶ 22. It is undisputed that the Pontiac did not, in fact, belong to Moses or his family.

It took Officers Veneri and Chong "[a] couple minutes" to get from Sandy Beach, where they were when they received the call for back up, to Makapuu Point. Testimony of Laura Chong (September 2, 1999) at 106. When they arrived, Chong parked her car alongside and to the front of the Pontiac, and Veneri parked his car behind hers. Veneri Decl. ¶ 12. Moses then tried to walk away. *See* Haskell Decl. ¶ 25; Veneri Decl. ¶ 15. Chong grabbed one of Moses' arms and directed him to sit down on one of the concrete pillars on the passenger side of the Pontiac. Haskell Decl. ¶ 27; Veneri Decl. ¶¶ 11 and 16.

"A few minutes later," Haskell tried to handcuff Moses, and "a scuffle ensued." Veneri Decl. ¶ 18. Somehow, Moses got hold of the gun carried by one of the officers and used it to shoot Haskell. Moses Testimony at 38–41; Veneri Decl. ¶ 18.

Haskell fell to the ground. Moses then pointed the gun at Haskell's head. At that point, Veneri let out a yell. Moses shifted his target to point the gun at Veneri. *Id.* Moses then made a "bee line" for Haskell's squad car, parked across the street. Moses opened the door and squatted behind it, then reached into the car, apparently searching for car keys in the ignition. Veneri Decl. ¶ 20. From behind the door, Moses took a shot at Veneri. Veneri responded by shooting Moses several times. Veneri Decl. ¶¶ 22–23.

Viewing the facts in the light most favorable to Haskell, the court assumes on this record that at least three minutes passed from the time Moses got out of the Pontiac to the time Haskell was shot. It is undisputed that it took Veneri and Chong at least one minute to drive from Sandy Beach to Makapuu Point. Chong characterized this drive as taking "[a] couple minutes." Chong Testimony at 106. Haskell submitted Veneri's declaration, which states that "[a] few minutes" (or at least two minutes) passed between Veneri's arrival on the scene and Haskell being shot. Veneri Decl. ¶ 18. The above undisputed evidence establishes that at least three minutes passed between the time Moses left the Pontiac and the time Haskell was shot.

cause it contradicts Haskell's earlier sworn statements on this point. *See Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991) ("a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony"). *Accord Darnell v. Target Stores,* 16 F.3d 174, 176–77 (7th Cir. 1994); *Jack v. Trans World Airlines,* 854 F.Supp. 654, 661 (N.D.Cal.1994). State Farm argues that evidence at Moses' trial indicates that Moses was merely trying to steal the bag inside the Pontiac, not trying to steal the Pontiac itself. The court finds this earlier evidence inconclusive. For example, Haskell testified that he believed he "had a UEMV case, unauthorized entry into a motor vehicle." Haskell Testimony at 16. Although

Haskell did not testify that he thought Moses was trying to steal the Pontiac, his testimony permits the inference that, although Moses had merely broken into the car, he might have been attempting to steal the car. Accordingly, the court disagrees with State Farm that Haskell is now attempting to create a "sham" issue of fact by contradicting his prior sworn testimony, as opposed to merely explaining that testimony. The court notes that Moses was also equivocal on this point. Moses testified that he chose the Pontiac because of the bag inside the car. Moses Testimony at 19. This testimony could support the proposition that Moses chose to steal the Pontiac because it contained a bag. *See id.*

Haskell looks to two automobile insurance policies as potentially providing coverage for his injuries: Automobile Policy No. 0657–723–51B issued to Haskell, and Automobile Policy No. 0598–413–51B issued to Robert Haskell, Haskell's father, with whom Haskell lived. *See* Declaration of Al Uyechi (undated, but filed with State Farm's Motion for Summary Judgment on October 10, 2001) ¶¶ 4–5. The Owner's Policy Declarations are apparently identical for both policies and are attached as Exhibit D to Uyechi's declaration. Uyechi Decl. ¶ 6. The policy contains uninsured, as well as underinsured, motor vehicle coverage:

> We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *uninsured motor vehicle.* The *bodily injury* must be caused by accident arising out of the operation, maintenance or use of an *uninsured motor vehicle.*

Policy, Section III, Coverages U and U4 (attached as Exhibit D).[2] The policy defines "Uninsured Motor Vehicle" as:

1. A land motor vehicle, the ownership, maintenance or use of which is not insured or bonded for bodily injury liability at the time of the accident; or

2. a "hit-and-run" land motor vehicle:

 a. whose owner or driver remains unknown; and

 b. which causes an accident resulting in *bodily injury* to an insured.

*Id.*

State Farm denied coverage under these facts. *See* Exhibit 3 (letter from Robert A. Abe to Earl Haskell (May 18, 1999)). Haskell then filed suit.

### III. SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when:

> the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see also Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323, 106 S.Ct. 2548. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000).

The burden initially lies with the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548). "When the moving party has carried its burden under Rule 56(c), its

---

2. Although the policies provide for coverage for owners and drivers, the parties agree that Haw.Rev.Stat. § 431: 10C–301(b)(3) requires such coverage to be available to "owners and operators." Accordingly, State Farm agreed at the hearing that coverage existed for owners, drivers, and operators.

opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv.*, 809 F.2d at 630 (quotation omitted). At least some " 'significant probative evidence tending to support the complaint' " must be produced. *Id.* (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact").

"[I]f the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Arch'l Bldg. Prods., Inc.· v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987) (*citing Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988); *accord Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion"). However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.*, 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to the nonmoving party. *Id.* Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

## IV. *ANALYSIS*.

State Farm removed this case from state court based on diversity jurisdiction. *See* Notice of Removal (March 22, 2001). Federal courts sitting in diversity apply state substantive law and federal procedural law. *See Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). When interpreting state law, a federal court is bound by the decisions of a state's highest court. *Arizona Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir.1995). In the absence of such a decision, this court predicts how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. *Id.*

Under Hawaii law, general rules of contract construction apply to the interpretation of insurance contracts. *Dawes v. First Ins. Co. of Haw.*, 77 Hawai'i 117, 121, 883 P.2d 38, 42, *recon. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994). The policy must be read as a whole and construed in accordance with the plain meaning of its terms, unless it appears that a different meaning is intended. *Id.* at 121, 883 P.2d at 42; *First Ins. Co. of Haw. v. State*, 66 Haw. 413, 423, 665 P.2d 648, 655 (Haw.1983). *See also* Haw.Rev.Stat. § 431:10–237 (Michie 2001) (in effect at the time Haskell was shot) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy"). Because insurance contracts are contracts of adhesion, they must be construed liberally in favor of the insured, and any ambiguities must be resolved against the insurer. Put another way, the rule is

that policies are to be construed in accordance with the reasonable expectations of a layperson. *Dawes*, 77 Hawai'i at 131, 883 P.2d at 42.

 In addition, insurance policies are governed by statutory requirements, which are read into each policy. When the terms of an insurance policy are in conflict with statutory language, the statute takes precedence over the terms of the policy. *Id.* at 121–22, 883 P.2d at 42–43. Because the uninsured motorist statutes are remedial in nature, they are liberally construed. *Id.* at 123, 883 P.2d at 44.

 The burden is on the insured to establish coverage under an insurance policy. *See Sentinel Ins. Co. v. First Ins. Co. of Haw.*, 76 Hawai'i 277, 291 n. 13, 875 P.2d 894, 909 n. 13 (Haw.1994) (as amended on grant of reconsideration). The insurer has the burden of establishing the applicability of an exclusion. *See id.* at 914.

Haskell has uninsured motorist coverage if his injuries arise out of "the operation, maintenance or use of an *uninsured motor vehicle.*" *See* Policy, Section III, Coverages U and U4. Haskell's insurance policies do not define "operation, maintenance or use" of an automobile. However, Hawaii's insurance code defines "operation, maintenance or use" of an automobile:

> "Operation, maintenance, or use with respect to a motor vehicle" includes occupying, entering into, and alighting from it, but does not include:
>
> (1) Conduct in the course of loading or unloading the vehicle, unless the accidental harm occurs in the immediate proximity of the vehicle. . . .

Haw.Rev.Stat. § 431: 10C–103 (Michie 2001) (in effect at the time Haskell was shot).

Haskell argues that his injuries arose out of three "uses" of automobiles. First, he contends that Moses was "using" the Pontiac when Moses was attempting to steal the bag from the Pontiac or to steal the Pontiac itself. Second, Haskell says that Moses was trying to use Haskell's squad car to escape when Haskell was shot. Finally, Haskell says that he himself was "using" the Pontiac because he was attempting to secure it. None of these arguments is persuasive.

### A. Moses was not "Using" the Pontiac for Purposes of Uninsured Motorist Coverage.

 Haskell argues that Moses was operating or using the Pontiac by either trying to "unload" it (e.g., take the bag out of it) or by trying to drive the Pontiac away (e.g., steal the Pontiac). The court disagrees that Moses was "operating" or "using" the Pontiac under either scenerio.

Haskell's interpretation of the word "unload" is untenable. As noted above, a person is "using" a motor vehicle for purposes of uninsured motorist coverage when "occupying, entering into, and alighting from" the vehicle. Haw.Rev.Stat. § 431: 10C–103. Hawaii's insurance code states that "using" does not include "loading" or "unloading" a vehicle "unless the accidental harm occurs in the immediate proximity of the vehicle." *Id.* The Hawaii Supreme Court noted that it is doubtful that the "immediate proximity of the vehicle" requirement was intended to apply to Hawaii's uninsured motorist statutes. In any event, for purposes of uninsured motorist coverage, the Hawaii Supreme Court limited that proximity requirement "to the context of conduct 'in the course of loading or unloading the vehicle.' " *Id.* Because Moses had been outside the vehicle (and no longer attempting to steal the bag or the Pontiac) for at least three minutes before he shot Haskell, it cannot be said that Haskell was injured in the course of unloading the Pontiac.

Haskell's alternative argument—that he was injured as a result of Moses' attempt to "use" the Pontiac by stealing it—is equally unpersuasive. Relying on statements in *Dawes*, 77 Hawai'i at 132, 883 P.2d at 53, Haskell says that, to determine whether uninsured motorist coverage exists, this court must examine whether Moses' occupancy of the Pontiac started a "chain of events" ending in Haskell's injury. The court finds Haskell's reading of *Dawes* too broad.

*Dawes* focused on the "chain of events" resulting in injury to a passenger in an insured vehicle being operated by a named insured (or a family member). *Id.* at 133, 883 P.2d at 54. In *Dawes*, an automobile broke down and a passenger was killed in a hit-and-run accident while walking from the broken automobile to obtain alternative transportation and assistance. *Id.* at 120, 883 P.2d at 40. Although the passenger had been walking for approximately twenty to twenty-five minutes and had traveled about one mile from the insured vehicle when she was struck and killed, the Hawaii Supreme Court determined that she was killed during a "chain of events" that started with her occupancy of the insured automobile. Therefore, uninsured motorist benefits were payable. Implicit in the *Dawes* holding is the concept that coverage is triggered by a layperson's reasonable expectation that a death resulting from the breaking down of a vehicle will be covered. *See id.* at 121, 883 P.2d at 42.

*Dawes* is distinguishable from this case. This case does not involve coverage for a passenger. The Hawaii Supreme Court noted that Hawaii's uninsured motorist statutes mandate that coverage extend to injuries received by pedestrians when some connection with the insured vehicle is shown. *Id.* at 131, 883 P.2d at 52. Given the remedial nature of the uninsured motorist statutes, it is not surprising that coverage exists for a passenger killed by a hit-and-run vehicle while walking from a broken automobile to obtain alternative transportation and repair assistance. A reasonable layperson expects coverage under those circumstances.

In the present case, however, this court would have to perform mental gymnastics to find that Haskell was a pedestrian who was injured "during the chain of events ... caused by an accident involving an uninsured motor vehicle." *Dawes*, 77 Hawai'i at 133, 883 P.2d at 54. It is true that, but for Haskell's investigation of criminal activity occurring in the Pontiac, Haskell would never have been injured. *Dawes* did not, however, mandate that uninsured motorist insurance cover injuries whenever a "but for" test is satisfied. Instead, *Dawes* clearly contemplated that a covered injury be "caused by an accident involving an uninsured motor vehicle."[3] *Dawes*, 77 Hawai'i at 133, 883 P.2d at 54. In requiring this direct causal link, *Dawes* was following the approach taken earlier in *AIG Haw. Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 640–41, 851 P.2d 321, 331 (1993), which noted that there was uninsured motorist coverage when no act of independent significance occurred to break the causal link. No direct causal link exists here. Instead, the Pontiac was related to Haskell's injury only in the remotest sense. The Pontiac could have just as easily been a house, as it was the events that occurred outside the Pontiac that led to Haskell's injury.

To satisfy the coverage terms, a claimant must do more than present a story in which there happens to be the passing presence of an uninsured vehicle—that

---

3. Because the court finds an insufficient causal link between Haskell's injury and an uninsured motor vehicle, the court need not determine whether Haskell was injured in an "accident."

is, the use of the uninsured vehicle must relate relatively directly to the accident that caused the claimant's injury. Absent such a relationship, there is not the requisite "use" of the vehicle for purposes of the uninsured motorist insurance.

1 Alan I. Widiss, *Uninsured & Underinsured Motorist Ins.* § 11.4 (Rev.2d ed 1999) at 681–82.

This court is guided by the Ninth Circuit's decision in *State Farm Mut. Auto. Ins. Co. v. Fernandez,* 767 F.2d 1299 (9th Cir.1985). Decided under Hawaii law, *Fernandez* involved the issue of whether a stab wound arose out of the ownership, maintenance, or use of an uninsured motor vehicle. Fernandez was stabbed by White in a confrontation that occurred after both got out of their cars, having each driver flashed high-beams at the other. *Id.* at 1300. The Ninth Circuit held that the term "arising out of" required a minimum causal connection between the use of an insured vehicle and the injury. The "alighting" from the vehicle and Fernandez's injury were "connected only in a chronological sense." *Id.* at 1302. The intervening stabbing by White "broke the chain of causation between the use of the headlights and the stabbing wound." *Id.*

Haskell argues that the question of whether the causal link was broken is a question of fact to be resolved at trial. This court, however, finds that no reasonable juror could find the chain of causation unbroken. As a matter of law, the causal link was broken by the events that occurred outside the Pontiac. *See Iolab Corp. v. Seaboard Sur. Co.,* 15 F.3d 1500, 1506 n. 4 (9th Cir.1994) ("Although causation is a question of fact, it may be decided as a matter of law [on a motion to dismiss or for summary judgment] if, under undisputed facts, reasonable minds could not differ"). Critical to this court is the passage of at least three minutes (and proba-

bly more) between when Moses left the Pontiac and when Haskell was shot. The court is not stating a bright-line rule that being out of the car for more than three minutes always breaks the causal link. Hawaii case law precludes such a rule. *See Dawes,* 77 Hawai'i at 119–20, 133, 883 P.2d at 40–41, 54 (allowing coverage for a passenger killed while seeking alternative transportation and repair assistance after the automobile in which she was riding broke down). Instead, the court concludes that the undeniable passage of time, combined with the other circumstances of this case, establishes a break in the chain of events. Among the other circumstances establishing the break are Haskell's participation in the separate act of arresting Moses and the commission by Moses of an intentional tort. *See Fernandez,* 767 F.2d at 1302 (stating that an intervening tortious act broke the chain of causation between use of a vehicle and the injury).

The court notes that none of the authorities cited by Haskell demonstrates entitlement to coverage. Except for *Dawes,* all of those cases involve injuries concurrent to some actual use of a car. *See, e.g., Caraang,* 74 Haw. at 640–41, 851 P.2d at 331 (finding uninsured motorist coverage for a driver whose passenger shot another driver); *Ganiron v. Hawaii Ins. Guar. Assoc.,* 69 Haw. 432, 436, 744 P.2d 1210, 1212 (1987) (finding uninsured motorist coverage for a driver who was shot by an unidentified individual driving another car); *see also Cagle v. Playland Amusement Inc.,* 202 So.2d 396, 398–99 (La.App. 1967) (finding "use" of a car by a person shot when a security guard's gun discharged while the guard was trying to break a car window with his gun to get into the car, in which the keys had been locked); *State Farm Mut. Auto. Ins. Co. v. Whitehead,* 711 S.W.2d 198, 201 (Mo.Ct. App.1986) (holding that, for purposes of uninsured motorist coverage, a passenger

was injured during the "use" of a car when a police officer attempted to secretly transport a suspect to the police station and a gun fight ensued inside the car between the police officer and the suspect); *Willard v. Kelley*, 803 P.2d 1124, 1125–26, 1131 (Okla.1990) (finding a question of fact as to whether someone had "used" a car for purposes of uninsured motorist coverage when a police officer was shot immediately upon stepping out of his car by a suspect who fired a gun while still in his car after a car chase).

Accordingly, the court finds that Moses was not "using" the Pontiac for purposes of uninsured motorist coverage.

### B. *Moses was not "Using" Haskell's Squad Car.*

■ Haskell next argues that he was shot in the course of Moses' attempt to use Haskell's squad car to escape. This argument is far-fetched.

Haskell was shot before Moses even began his "bee-line" to Haskell's squad car. Nothing in the statutory language defining operation and use of a motor vehicle suggests that a mere intent to go toward a car falls within that definition. At best, even assuming that, at the time he shot Haskell, Moses was planning to ride away in Haskell's squad car, Haskell is arguing that Moses was "using" a motor vehicle because he was merely planning to "load" himself into the squad car. However, "loading" a vehicle only amounts to using or operating a vehicle when the injury occurs during the actual course of loading or unloading of the vehicle. *See Dawes*, 77 Hawai'i at 132, 883 P.2d at 53. Haskell was not shot as Moses was actually "loading" himself into the squad car. To hold otherwise would be to extend coverage to any injury that might occur while a person walked to a parked car. Under Haskell's theory, a person carrying groceries to her car who accidently tripped over a toddler in her path could be said to have been "using" a car. Hawaii's car insurance laws were not intended to extend that far.

Moreover, Haskell cites no authority suggesting that a tortfeasor's wish to "use" someone else's car gives rise to coverage when the tortfeasor injures the car owner several minutes after the owner has left the car. This case presents circumstances different from those in cases decided in other jurisdictions involving injuries either suffered in a vehicle or sustained immediately after a victim had left a vehicle. *See, e.g., Pena v. Allstate Ins. Co.*, 463 So.2d 1256, 1259 (Fla.App.1985) (holding that, for purposes of personal injury protection benefits, a cab driver was injured in the "use" of the cab when a passenger, while inside the taxi, tried to rob the cab driver); *Willard*, 803 P.2d at 1131 (finding a question of fact as to whether a vehicle was being "used" when an officer had stepped out of his car after a car chase and was then immediately shot by a suspect sitting in another car); *Carrigan v. State Farm Mut. Auto. Ins. Co.*, 326 Or. 97, 949 P.2d 705, 709 (1997) (holding that a vehicle was "used" and personal injury protection coverage was available to a carjacking victim who got out of a vehicle at the direction of the carjacker and was then immediately shot by the carjacker, who had also gotten out of the vehicle). Haskell's reliance on these distinguishable cases is unjustified. Moses was not using Haskell's squad car for purposes of uninsured motorist coverage.

### C. *There was no "Use" of a Vehicle Arising Out of Haskell's Attempt to Secure the Pontiac.*

■ Haskell's third argument is that he was "using" the Pontiac by trying to "secure" it. Haskell says that he was shot in the chain of events arising from his attempt to prevent Moses from stealing

either the Pontiac or the bag inside the Pontiac. Haskell likens himself to the injured ambulance worker in *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Olson*, 69 Haw. 559, 751 P.2d 666 (1988). In *Olson*, the Hawaii Supreme Court held that an ambulance worker injured while lighting a flare right outside the ambulance was "using" a motor vehicle for purposes of uninsured motorist coverage. The court reasoned that Olson's lighting of a flare was an activity reasonably calculated to safeguard the ambulance and its occupants from a motor vehicle accident. *Olson*, 69 Haw. at 564, 751 P.2d at 669, *overruled in part on other grounds, Dawes*, 77 Hawai'i at 131, 883 P.2d at 52. Unlike the present case, *Olson* involved an injury that occurred while the victim was actually attempting to safeguard a vehicle. By contrast, Haskell was injured several minutes after he had "secured" the Pontiac. Indeed, Haskell was injured while involved in the separate act of arresting Moses outside of the vehicle.

Haskell's reliance on *Metropolitan Prop. & Cas. Ins. Co. v. Neubert*, 969 P.2d 733 (Colo.Ct.App.1998), is equally unavailing. In *Neubert*, a person was accosted by passengers in a vehicle when he went to render assistance to them. Apparently, the driver of the vehicle had been shot by an unknown person, causing the vehicle to crash, and the passengers thought the good samaritan had fired the gun. *Id.* at 734. The Colorado court applied a "but for" test to determine whether the person's injuries had been caused by use of a vehicle such that personal injury protection coverage was available. *Id.* The Colorado court held that the victim's rendering of assistance at the scene of a car accident was a foreseeable event arising out of use of the vehicle and therefore concluded that the injuries were covered by the policy. *Id.* at 735. *Neubert* is distinguishable from this case. The injury in that case occurred as assistance was being offered.

Haskell, however, was not injured while safeguarding the Pontiac. Instead, Haskell was injured minutes after the Pontiac had been "secured." Nor is there any authority indicating that Colorado's "but for" test applies under Hawaii law.

As Haskell has failed to cite any persuasive authority supporting his contention that he was "using" the Pontiac under the facts of this case, his arguments fail.

## V. CONCLUSION.

Because Haskell's injuries did not arise out of the use of a vehicle, there is no uninsured motorist coverage under either of the two policies at issue in this case. Accordingly, summary judgment is granted in favor of State Farm and against Haskell. The Clerk of the Court is directed to enter judgment in favor of State Farm.

IT IS SO ORDERED.